# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

TAYLOR L.M. WYLLIE,

            Plaintiff,

  v.

NANCY BERRYHILL, Acting Commissioner of Social Security,

            Defendant.

Case No. 3:17-cv-05157-TLF

ORDER AFFIRMING DEFENDANT'S DECISION TO DENY BENEFITS

Taylor L.M. Wyllie has brought this matter for judicial review of defendant's denial of her applications for child's disability insurance and supplemental security income (SSI) benefits. The parties have consented to have this matter heard by the undersigned Magistrate Judge. 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73; Local Rule MJR 13. For the reasons set forth below, the Court affirms the Commissioner's decision denying benefits.

## FACTUAL AND PROCEDURAL HISTORY

Ms. Wyllie protectively applied for SSI on July 22, 2013. Dkt. 11, Administrative Record ("AR") 13. On May 5, 2014, she applied for child's insurance benefits based on disability. *Id.* Both applications alleged disability beginning July 11, 1995. *Id.* Ms. Wyllie later amended this alleged onset date to October 18, 2011. AR 38-39. Both applications were denied on initial administrative review and on reconsideration. AR 13. A hearing was held before an administrative law judge (ALJ) on February 11, 2015. AR 34-75. Ms. Wyllie, Mr. James Dumesnil, and a vocational expert appeared and testified. The ALJ found that the relevant date

ORDER - 1

for determining disability was July 10, 2013, and neither party challenges this determination. AR 13.

In a written decision on September 25, 2015, the ALJ found that Ms. Wyllie could perform jobs existing in significant numbers in the national economy, and therefore that she was not disabled. AR 13-28. The Appeals Council denied Ms. Wyllie's request for review on January 25, 2017, making the ALJ's decision the final decision of the Commissioner. AR 1. Ms. Wyllie appealed that decision in a complaint filed with this Court on March 2, 2017. Dkt. 3; 20 C.F.R. §§ 404.981, 416.1481.

Ms. Wyllie seeks reversal of the ALJ's decision and remand for an award of benefits, or in the alternative for further administrative proceedings, arguing the ALJ erred:

(1)   in evaluating the medical evidence in the record;

(2)   in discounting Ms. Wyllie's credibility;

(3)   in rejecting lay witness evidence;

(4)   in assessing Ms. Wyllie's residual functional capacity; and

(5)   in finding Ms. Wyllie could perform other jobs existing in significant numbers in the national economy.

For the reasons set forth below, the Court finds that the ALJ did not err as Ms. Wyllie alleges. Accordingly, the Court affirms the decision to deny benefits.

DISCUSSION

The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. §§ 404.520, 416.920. If the ALJ finds the claimant disabled or not disabled at any particular step, the ALJ makes the disability determination at that step and the sequential evaluation process ends. *See id*. At issue here is the ALJ's weighing of different pieces of medical and opinion evidence, her discounting of Ms. Wyllie's testimony, her

ORDER - 2

weighing of lay testimony, and her resulting assessment of Ms. Wyllie's RFC and conclusion that she can perform jobs in the national economy.

This Court affirms an ALJ's determination that a claimant is not disabled if the ALJ applied "proper legal standards" in weighing the evidence and making the determination and if "substantial evidence in the record as a whole supports" that determination. *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Trevizo v. Berryhill*, No. 15-16277, 2017 WL 4053751, at *6 (9th Cir. Sept. 14, 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). This requires "'more than a mere scintilla,'" though "'less than a preponderance'" of the evidence. *Id.* (quoting *Desrosiers*, 846 F.2d at 576).

This Court will thus uphold the ALJ's findings if "inferences reasonably drawn from the record" support them. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). If more than one rational interpretation can be drawn from the evidence, then this Court must uphold the ALJ's interpretation. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

I.  The ALJ's Evaluation of the Medical and Other Opinion Evidence

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Where the evidence is inconclusive, "'questions of credibility and resolution of conflicts are functions solely of the [ALJ]'" and this Court will uphold those conclusions. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (quoting *Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971)); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999). As part of this discretion, the ALJ determines whether inconsistencies in the evidence "are material (or are

ORDER - 3

in fact inconsistencies at all) and whether certain factors are relevant" in deciding how to weigh medical opinions. *Morgan*, 169 F.3d at 603.

The ALJ must support his or her findings with "specific, cogent reasons." *Reddick*, 157 F.3d at 725. To do so, the ALJ sets out "a detailed and thorough summary of the facts and conflicting clinical evidence," interprets that evidence, and makes findings. *Id.* The ALJ does not need to discuss all the evidence the parties present but must explain the rejection of "significant probative evidence." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citation omitted). The ALJ may draw inferences "logically flowing from the evidence." *Sample*, 694 F.2d at 642. And the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

In general, the ALJ gives more weight to a treating physician's opinion than to the opinions of physicians who do not treat the claimant. *See Lester v. Chater*, 81 F.3d. 821, 830 (9th Cir. 1995). Nonetheless, an ALJ need not accept a treating physician's opinion that "is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." *Batson*, 359 F.3d at 1195; *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

To reject the uncontradicted opinion of either a treating or examining physician, an ALJ must provide "clear and convincing" reasons. *Lester*, 81 F.3d at 830. When other evidence contradicts the treating or examining physician's opinion, the ALJ must still provide "specific and legitimate reasons" to reject that opinion. *Id.* at 830-31. In either case, the ALJ's reasons must be supported by substantial evidence in the record. *Id.* Next, an ALJ gives greater weight to an examining physician's opinion than that of a non-examining physician. *Id.* at 830. Finally, a non-examining physician's opinion may constitute substantial evidence for an ALJ's findings if

ORDER - 4

that opinion "is consistent with other independent evidence in the record." *Tonapetyan*, 242 F.3d at 1149.

    A.    <u>Examining Doctor: John T. Lloyd, PhD</u>

Dr. Lloyd, a clinical psychologist, evaluated Ms. Wyllie in March 2014. AR 308. He based his findings on a mental status examination he performed, psychological testing using the Wechsler Adult Intelligence Scale IV, Wechsler Adult Memory Scale IV, and Trail Making Test, and his review of James Dumesnil's notes on his therapy with Ms. Wyllie. *See* AR 308-322. In the mental status examination, Dr. Lloyd observed that Ms. Wyllie's grooming was "good," her "interpersonal style" was "quiet and withdrawn," she seemed to pay "adequate attention," she made good eye contact, and her communication was clear and simple. AR 309. He noted she denied suicidal thoughts. *Id.* He also noted that she appeared anxious and her speech was hesitant. *Id.* And he found that Ms. Wyllie showed "limited persistence" and a pace that "appeared to be slightly slower than average." *Id.* Based on the tests he administered, Dr. Lloyd observed that Ms. Wyllie showed average intellectual functioning, high-average verbal comprehension and perceptual reasoning, and "a very good memory." AR 310-11. He found, though, that Ms. Wyllie's performance on a test measuring "flexibility of thought" was "in the impaired range." AR 311.

Dr. Lloyd diagnosed Ms. Wyllie with social phobia, generalized anxiety disorder, and mild cognitive impairment. AR 311. He opined that Ms. Wyllie "has done well to recover from her first four years of life," though she has "residual anxiety which makes it difficult for her to be involved socially." He found her post-traumatic stress disorder was in remission but that "new stress could revive her symptoms." *Id.* He recommended Ms. Wyllie "become involved in intensive psychotherapy with face-to-face contact as opposed to phone or Skype contact." *Id.* He

ORDER - 5

also opined that due to "mild cognitive disturbance," Ms. Wyllie needs "extra time for learning tasks or tasks requiring problem solving." *Id.*

The ALJ assigned "some weight to Dr. Lloyd's opinion," noting that the RFC "accommodated [Ms. Wyllie's] cognitive impairment by limiting her to simple, routine tasks." AR 25; *see* AR 27-28. The ALJ accepted that Ms. Wyllie should not work with the public because it "would be more stressful and anxiety provoking." AR. 25. But the ALJ assigned little weight to Dr. Lloyd's more restrictive opinion "that the claimant could not work around people." *Id.* She found that Dr. Lloyd's examination and test findings, along with Ms. Wyllie's daily activities, "do not support greater limitations." *Id.* She reasoned that whereas Dr. Lloyd only saw Ms. Wyllie once and reviewed only Mr. Dumesnil's 2013 report, several other treatment providers examined Ms. Wyllie during the relevant period "and none of them commented that she was anxious or presented with any other signs of psychiatric symptoms." *Id.*; *see* AR 308.

The record supports this reasoning. In particular, Ms. Wyllie's primary care providers reported at each visit that Ms. Wyllie was fully oriented and insightful, made good eye contact, displayed a normal mood and affect, and presented as well-groomed and in no acute distress. *See* AR 280, 334, 337, 340. The ALJ observed that Ms. Wyllie had these appropriate interactions even though at least some providers were unfamiliar to her. *See* AR 25. And Ms. Wyllie's own testimony, the function report she submitted, and the letters her grandfather and brother provided all demonstrate Ms. Wyllie's "good relationship" with her family. *See* 48-49, 247, 270 (stating that Ms. Wyllie and brother call or text several times per week). The ALJ thus reasonably found that the record shows Ms. Wyllie's "relationship with her adoptive family and her appropriate interactions with treatment providers . . . support a conclusion that she can tolerate occasional, superficial contact with coworkers that does not entail teamwork." AR 25. Moreover, this

specific limitation is not necessarily inconsistent with Dr. Lloyd's more ambiguous statement that Ms. Wyllie "will not be able to work around people." *See* AR 311.

B.     Other Medical Source: James Dumesnil, MS

Mr. Dumesnil, a licensed counselor and a director of Families By Design (the same company that Ms. Wyllie and her mother worked for), testified at the ALJ hearing that since 2008 he has provided Ms. Wyllie with "telemental health therapy" through telephone and video chat sessions. AR 57, 272, 292-293. He testified that he and Ms. Wyllie meet this way about once a month and that they usually meet in person once per year. AR 57, 59. The record includes a number of treatment notes, forms, and reports by Mr. Dumesnil. *See* AR 282-90, 306-07, 324-27, 365-70, 372-373.

On a September 2012 form in support of Ms. Wyllie's mother's request for "difficulty of care" payments from the State of Hawaii, Mr. Dumesnil stated that Ms. Wyllie needed homeschooling because "of social phobias and social anxiety disorder," and needed her mother's support "to minimize risk of triggers/flashbacks/regressions [and] overstimulation." AR 285.

On another Hawaii form in July 2013, Mr. Dumesnil stated that Ms. Wyllie will "likely" have "lifelong challenges." AR 282. He opined that Ms. Wyllie "still has fear of situations, startle response, still high to new and routine stimuli" and that she "[b]ecomes agitated" and "inflicts self-harm." AR 283.

In a summary of Ms. Wyllie's progress in September 2013, Mr. Dumesnil opined that Ms. Wyllie "has made some strides forward therapeutically," though in completing high school she "was critically dependent on her mother's participation and leadership." AR 286-87. He referred to trauma that Ms. Wyllie experienced up to age four, including "physical, emotional, and sexual" abuse. AR 288. He stated that Ms. Wyllie continues to have difficulty trusting others

ORDER - 7

and struggles with "depression and sometimes-severe emotional dysregulation, leading to self-harm, self-mutilation, suicidal thoughts, nightmares and night terrors." *Id.* He stated that Ms. Wyllie "has a paralyzing fear of social situations" and is "extremely limited in her ability to navigate the world," needing a family member to accompany her to travel. *Id.* He opined that Ms. Wyllie "cannot keep herself safe, when there is anything unpredictable, unknown or potentially threatening." AR 289. And he concluded that Ms. Wyllie "cannot compete in the usual marketplace of work, or even of school," and that "being forced into work . . . will result in regression, disorganization, then self-harm, and likely soon lethal attempts at self-harm and eventual self-destruction." *Id.* He added, "It has been miraculous that she is as stable as she is." *Id.*

In March 2014, Mr. Dumesnil wrote that Ms. Wyllie's

> trauma triggers are such that regressions, flashbacks, nightmares, increased fear and anxiety, especially outside of the home; reduced ability to shop with family; reduced ability to go to public library; or reduced ability to go to school classroom or supervised job sites has once again become daily routine symptomatology as her Post Traumatic Stress response has been re-constellated.

AR 307.

In June 2014, Mr. Dumesnil wrote that "anxiety and panic has remained very high for" Ms. Wyllie. He also wrote: "Upon meeting [Ms. Wyllie], outsiders, including mental health professionals, will not perceive these difficulties. She is an attractive woman, and she is also intelligent, smiles easily (as a defense mechanism), and seems very engaging. . . . It is not apparent to outsiders, due to the smile, that she is overwhelmed and even suffering panic attacks." AR 324. Later that month, he wrote that Ms. Wyllie "has gotten progressively stronger in the last few months." AR 326.

At the disability determination hearing Mr. Dumesnil testified that Ms. Wyllie "cannot do

ORDER - 8

a full-time job outside the home." AR 60. He explained that due to post-traumatic stress disorder from her early life, Ms. Wyllie has "a lot of fears and phobias, anxiety and panic where she cannot be in new situations, cannot be left alone." AR 61. He stated Ms. Wyllie was home-schooled because she is very easily overwhelmed and would have felt overstimulated and threatened at school. *Id.* He testified that Ms. Wyllie has difficulty with household tasks in part because she must be "reminded that the fire is still on or the stove is on." AR 62. He opined that Ms. Wyllie may be presenting herself as externally smiling and happy, but is actually in a "huge panic" or will have a period of decompensation later. *See* AR 63-64. He testified that he does not "think [Ms. Wyllie] would live for too very long if she was living alone right now." AR 68. He acknowledged that his information about Ms. Wyllie's household behavior came from her mother. AR 62.

The ALJ did "not find Mr. Dumesnil's testimony entirely credible and assign[ed] very little weight to" his September 2013 written statement, the forms he submitted, and his treatment notes. AR 24. The ALJ found that "the severity of symptoms [Mr. Dumesnil] described is wholly unsupported by the treatment notes describing [Ms. Wyllie's] contacts with other care providers." *Id.* The ALJ pointed out that notes from Jamestown Family Health Clinic and Olympic Medical Center during the same period do not note any of the psychiatric symptoms on which Mr. Dumesnil based his opinions. *Id.* She found that in contrast to Mr. Dumesnil's testimony that Ms. Wyllie "cannot be in new situations, cannot be alone" and is "very easily overwhelmed," her treatment notes do not include observations that she showed anxiety or unusual behavior at the hospital or clinic. *Id.* She also observed that Ms. Wyllie's medication has not changed since October 2012 and the record did not indicate that her providers recommended any other course or found a need to refer her to a psychiatrist. *Id.* And the ALJ found that

ORDER - 9

although Mr. Dumesnil "variously suggested that the claimant could not survive if she lived alone and would engage in self-harm or worse," Ms. Wyllie herself did not report symptoms of that severity, nor did other treatment providers, and "[t]here is no documentation that [Ms. Wyllie] was engaging in self-harm behaviors." *Id.*

These are germane reasons to reject Mr. Dumesnil's opinions, and the record supports them.

Ms. Wyllie argues that a claimant can use an "other" source opinion, like Mr. Dumesnil's, to "provide insight into the severity of the individual's impairment(s) and how it affects the individual's ability to function. *See* SSR 06-03p. She also contends that such an opinion from an "other medical source," or even from a "non-medical source" who has seen the claimant in a professional capacity, can outweigh the opinion of an "acceptable medical source" if the other source has seen the claimant more often, has more evidence supporting his or her opinion, and gives an opinion more consistent with the record as a whole. SSR 06-03p.

The Court has determined that Mr. Dumesnil's is not such an opinion. Instead, the record supports the ALJ's finding that Mr. Dumesnil's opinions were inconsistent with the other evidence in Ms. Wyllie's treatment record.

Ms. Wyllie's therapy was limited to mostly online sessions with Mr. Dumesnil that began in 2008, though the record does not indicate how many sessions were conducted before February 2014. *See* AR 20, 282, 286-90, 306-07, 365-70. As the ALJ noted, Ms. Wyllie's treatment notes from her primary-care visits "do not mention [her] presenting as anxious, behaving unusually or showing any other signs of psychiatric symptoms." AR 24; *see* AR 280-81, 334-41, 359-64. Treating physicians' objective evaluations of Wyllie during those visits instead noted that she was oriented and insightful, made good eye contact, and displayed a normal mood and affect. AR

ORDER - 10

280, 335, 361; see also AR 337, 340 ("Well developed, well nourished . . . in no distress"). These contradictions in the record were a germane reason to reject Mr. Dumesnil's opinions.

The ALJ gave another germane and supported reason to reject Mr. Dumesnil's opinions: Ms. Wyllie did not seek medication for anxiety or depression or treatment from a psychiatrist, and her treating doctors did not see any need to consider such measures. AR 24; *see* AR 280, 334, 337. Conservative treatment is a specific and legitimate reason to reject an opinion that an impairment is disabling. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (holding conservative treatment for back injury was clear and convincing reason to disregard testimony that claimant was disabled).

### C. Lay Testimony

Ms. Wyllie's neighbors, Chuck and Linda Livingston, stated in a July 2013 letter that Ms. Wyllie is "very shy" and had told them "she went through extremely traumatic experiences." AR 209. *Id.* They observed that Ms. Wyllie "depends on her mother and older brother . . . to help her navigate emotionally and socially." *Id.* They stated that as time went on Ms. Wyllie became more comfortable around them. *Id.* They stated Ms. Wyllie does minor weeding for them on occasion, and has trouble focusing if she begins talking. *Id.* They concluded that "[i]t is inconceivable to us to think of her being able to get a job." *Id.*

The ALJ assigned "some weight" to the information from the Livingstons, but she found that it did not support a finding of a disabling mental condition. *See* AR 26, 209. The ALJ noted that Ms. Wyllie "does have a job, albeit very part time, and is mature enough to care for an aging horse and provide adoptive care for her adoptive mother." AR 26. The ALJ reasoned that, in any case, "[t]rouble focusing on a task while carrying on a conversation with one's employer does not support a finding of disabling mental condition." *See id.* And the ALJ noted that the

ORDER - 11

Livingstons did not mention Ms. Wyllie isolating indoors or rarely leaving the house. *Id.*

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Stout v. Commissioner*, *Social Security Administration*, 454 F.3d 1050, 1053 (9th Cir. 2006). An ALJ may disregard lay witness testimony "if the ALJ 'gives reasons germane to each witness for doing so.'" *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)).

Here, the ALJ gave germane reasons for discounting the Livingstons' statements, and the record supports them. Ms. Wyllie does have a "very part time" job in forwarding calls for Mr. Dumesnil's company, in addition to caring for an aging horse and caring for her mother. *See* AR 43, 48-49, 54. Moreover, the Livingstons' only statement that would strongly support a disability finding is the conclusory statement that they believe she could not hold a job. *See* AR 209. Such opinions are normally reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012).

Ms. Wyllie's grandfather, Allan Wylie, stated that "it is extremely difficult to her to go into public, even with me there to help support and encourage her." AR 247. He recounted a trip to an emergency room in which Ms. Wyllie told him she has to "stay away from humans." *Id.* During this trip, she went to the far side of the lobby are and tried to hide behind a post. *Id.* He also recounted trips to the library in which Ms. Wyllie "sits in the same chair in kind of a 'hidden' area – if that chair is occupied, . . . [Ms. Wyllie] becomes more stressed and appears withdrawn and nervous." *Id.*

The ALJ gave this statement "limited weight" because Allen Wyllie's observations that Ms. Wyllie attempts to hide in public places were inconsistent with treatment notes that show she

ORDER - 12

visited Jamestown Family Health Clinic and Olympic Medical Center without "clinicians witnessing anything like this behavior." Instead, the ALJ noted, those clinicians described Ms. Wyllie "as having normal, mood, affect and behavior." AR 26.

The record supports the ALJ's reasoning here, as well. The records from Ms. Wyllie's visits to these medical treatment facilities show Ms. Wyllie presenting without anxiety or stress symptoms. *See* AR 280-81, 334-41, 359-64 ("insightful," "good eye contact," "normal mood and affect," "well groomed, in no distress").

Ms. Wyllie's brother, Jordan, wrote in an undated letter that Ms. Wyllie "was an extremely shy and nervous child who wouldn't speak for a long while after coming to our home." AR 270. He said he currently sees Ms. Wyllie "three or four times a year for an average of about four days at a time." *Id.* He stated that, "[c]ommon business or social interactions are extremely difficult for [Ms. Wyllie]." *Id.* He also stated that Ms. Wyllie "[m]aking a call for a regular appointment becomes a monumental task." *See id.* He described Ms. Wyllie talking to him on the phone and being nervous about getting things wrong. *See id.* Jordan Wyllie described how Ms. Wyllie is putting off getting a driver's license because "even taking lessons is too much to think about." *Id.* He concluded that he could not "see [Ms. Wyllie] being able to function alone for many years," explaining that "[h]er social phobias, post-traumatic stress disorder and anxieties make for an extreme challenge." *Id.*

The ALJ assigned limited weight to this statement, again noting that the treatment records from Jamestown Health Clinic and Olympic Medical Center "make absolutely no mention of the claimant presenting as anxious or behaving unusually." AR 26. The ALJ further supported her finding by noting Ms. Wyllie "has not sought to try other psychotropic medications . . . and there is no indication that her primary care providers thought a psychiatric referral was warranted."

ORDER - 13

AR 27. As discussed above, the record supports the ALJ's characterization of her visits to these two medical treatment centers. *See* AR 280-81, 334-41, 359-64 (noting normal objective psychiatric indicators). Although Dr. Lloyd recommended "intensive psychotherapy with face-to-face contact" in March 2014, there is no indication that Ms. Wyllie followed this recommendation. *See* AR 311; *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (holding that failure to follow advice to seek treatment was valid reason to discount disability claim). Thus, the ALJ provided germane and supported reasons to assign Jordan Wyllie's testimony little weight.

    II.    <u>The ALJ's Evaluation of Ms. Wyllie's Testimony</u>

Questions of credibility are solely within the control of the ALJ. *Sample*, 694 F.2d at 642. The Court should not "second-guess" this credibility determination. *Allen*, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. *See id.* at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as substantial evidence supports that determination. *Tonapetyan*, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." *Lester*, 81 F.3d at 834 (citation omitted). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." *Lester*, 81 F.2d at 834. An ALJ cannot reject a claimant's pain testimony solely on the basis of a lack of objective medical evidence in the record. *See Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995). Such a determination can satisfy the clear and convincing requirement when the ALJ "specif[ies] what complaints are contradicted by what

ORDER - 14

clinical observations." *Regennitter v. Commissioner of Social Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1998); *see also Lester*, 81 F.3d at 834.

Ms. Wyllie testified that she suffers from debilitating anxiety that would make her unable to work with people or on a deadline. AR 47-51. She also testified that she has difficulty remembering to eat meals and take showers. AR 51-52.

The ALJ found that Ms. Wyllie's testimony supported some limitations, including no work with the public and only "occasional, superficial contact with coworkers that does not entail teamwork." AR 21. But the ALJ concluded that Ms. Wyllie's testimony about "the intensity, persistence and limiting effects" of her mental-health symptoms was "not entirely credible." AR 20. The ALJ found that that Ms. Wyllie received only "minimal health treatment" and the record from her primary care shows no "signs of psychiatric symptoms." AR 20.

The ALJ identified particular statements she found not credible and explained her reasons for that finding. For example, the ALJ did not credit Ms. Wyllie's statements that she depends on her family for emotional support, needs help managing her daily routine, and "is essentially unable to function outside the home without another family member present." The ALJ explained that these severe symptoms were inconsistent with Ms. Wyllie's treatment record. That record shows that since 2012 Ms. Wyllie has received only one medication, for insomnia and at the same dosage. *See* AR 280, 334, 337. The ALJ found that Ms. Wyllie's treatment record also indicates that she has not sought "ongoing mental health treatment" or to adjust her medication, and her primary-care providers have not seen a need to refer her to a psychiatrist. AR 20. The ALJ further found that Ms. Wyllie's treatment records "made absolutely no mention of her appearing anxious, behaving unusually or . . . show[ing] any other signs of mental distress." AR 21. She noted that treatment notes, which state Ms. Wyllie "cares for elderly adoptive mother"

ORDER - 15

and "does a lot of her personal care," contradict Ms. Wyllie's testimony that she depends on her mother to manage her daily activities. AR 21, 51-52, 337. Finally, the ALJ noted that the results of a March 2014 consultative psychological evaluation were also inconsistent with Ms. Wyllie's reports that she needed reminders for simple tasks like showering and eating. AR 22, 51-52. Ms. Wyllie's results showed high scores for memory, an average IQ, high-average verbal comprehension and perceptual reasoning, and average processing speed. AR 309-11.

These were clear and convincing reasons for the ALJ to discount Ms. Wyllie's testimony. As discussed above, the record supports the ALJ's assessment of Ms. Wyllie's mental health treatment as "minimal." *See* AR 280-81, 334-41, 359-64 (only medication throughout period was tranquilizer, while primary-care notes do not mention need for psychiatric referral), 374 (clinic reported no new treatment notes from July 2014 to June 2015). And as also noted above, objective medical evaluations were normal in her visits to Jamestown Family Health Clinic and Olympic Medical Center. *See* AR 280, 335, 337, 340, 361. In reviewing Ms. Wyllie's medical records in April 2014, Dr. Beth Fitterer opined that Ms. Wyllie had no "clear current symptoms" of her earlier trauma. *See* AR 83. Dr. Lisa Hacker reached similar conclusions two months later, finding Ms. Wyllie's "anxiety will periodically impede her social interactions and pace but [she is] capable of competitive employment." AR 101. The ALJ thus based her reasoning on substantial evidence in the record as a whole.

III. The ALJ's RFC Assessment

The Commissioner uses a claimant's residual functional capacity (RFC) assessment at step four of the five-step "sequential evaluation process" to determine whether he or she can perform his or her past relevant work, and at step five to determine whether he or she can do other work. SSR 96-8p, 1996 WL 374184, at *2.

ORDER - 16

The RFC is what the claimant "can still do despite his or her limitations." *Id.* A claimant's RFC is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. *Id.* However, an inability to work must result from the claimant's "physical or mental impairment(s)." *Id.* Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." *Id.* In assessing a claimant's RFC, the ALJ must also discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.* at *7.

Here, the ALJ found that Ms. Wyllie has the RFC

> **To perform a full range of work at all exertional levels but with the following nonexertional limitations: She can perform simple, routine tasks. The claimant should have no contact with the public. She can have occasional, superficial contact with coworkers that does not entail teamwork. The claimant needs a stable work environment.**

AR 18 (emphasis in original). Because, as discussed above, the ALJ did not make the errors Ms. Wyllie asserts in considering the medical evidence, her testimony, or the testimony of lay witnesses, the ALJ's RFC assessment completely and accurately describes Ms. Wyllie's functional limitations. Moreover, because Ms. Wyllie's challenge to the ALJ's finding at step five depends on the alleged errors in the RFC, and because the ALJ did not err in reaching the RFC, Ms. Wyllie has not shown any error at step five. *See* AR 18, 27; Dkt. 13, pp. 7-8.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ properly determined Ms. Wyllie to be not disabled. Defendant's decision to deny benefits is therefore AFFIRMED.

DATED this 2nd day of October, 2017.

*Theresa L. Fricke*

Theresa L. Fricke
United States Magistrate Judge

ORDER - 18